# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBUR DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

08/13/2025

LAURA A. AUSTIN, CLERK
BY: _/s/ Amy Fansler_
DEPUTY CLERK

|  |  |  |
|---|---|---|
| SARAH T.,[1] | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-CV-00023 |
| | ) | |
| FRANK BISIGNANO, | ) | By: Hon. Michael F. Urbanski |
| Commissioner of Social Security,[2] | ) | Senior United States District Judge |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Sarah T., ("Sarah") filed this action challenging the final decision of the Commissioner of Social Security denying her claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 423 and 1381a. In her brief in support of her application, Sarah argues that the determination of the administrative law judge ("ALJ") that she is not disabled is not supported by substantial evidence. Pl.'s Br., ECF No. 15. The Commissioner responds that substantial evidence supports the ALJ's determination that Sarah is not disabled. Def's Br., ECF No. 20.

As discussed more fully below, the court finds that substantial evidence supports the ALJ's determination that Sarah is not disabled. Accordingly, the Commissioner's determination that Sarah is not disabled is **AFFIRMED**, Sarah's Complaint is **DISMISSED**, and this matter is **STRICKEN** from the court's docket.

---

[1] Due to privacy concerns, the court adopts the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. In accordance with Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), he is substituted as defendant.

## I. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), and Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court will uphold a Social Security disability determination if "'(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings.'" Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023) (quoting Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 94 (4th Cir. 2020)).

A court may neither undertake a de novo review of the Commissioner's decision, reweigh conflicting evidence, nor substitute its judgment for that of the ALJ. Id. Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

2

Nevertheless, the court does not "'reflexively rubber-stamp an ALJ's findings.'" Oakes, 70 F.4th at 212 (quoting Arakas, 983 F.3d at 95). Remand is appropriate when the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## II. Claim History[3]

Sarah was born in 1975 and completed high school. R. 58. She has past relevant work as an assistant retail manager, stock clerk, and building supply sales attendant. R. 57. Prior to and throughout the relevant period, Sarah has run a non-profit organization that rescues and rehomes horses. R. 75. Sarah filed her current application for benefits on March 2, 2020, alleging an onset date of June 24, 2015, later amended to May 4, 2018. She alleges disability based on chronic Lyme disease, osteoarthritis, status post multiple fractures, low back and neck pain, left shoulder pain, migraines, fatigue, depression, anxiety attacks, and right hip pain. R. 487.

---

[3] Sarah first applied for disability benefits on September 3, 2025, and her application was denied at all administrative levels and in the district court on appeal. See Sarah T. v. Saul, No. 5:16-cv-26 (W.D. Va. July 6, 2020) (Dillon, J.). Sarah filed her current application for benefits on June 17, 2020. R. 426–29. Her claim proceeded through the administrative process and a hearing was held in front of an ALJ on December 7, 2021. R. 104–138. The ALJ denied her application on January 18, 2022. R. 233–254. Sarah sought review by the Appeals Council, which remanded the case to the ALJ for another hearing and decision. R. 262–63. After the third hearing, the ALJ once again denied benefits and it is this third decision that is before the court.

Sarah's case was before the ALJ on a remand from the Appeals Council. The Appeals Council directed the ALJ to revisit a prior determination that Sarah's depression was "non-severe" as there was evidence in the record that Sarah was diagnosed with a moderate depressive disorder and had been receiving outpatient treatment since 2018. R. 262–63. The ALJ also was directed to obtain additional information concerning Sarah's mental impairments, including, if warranted, a consultative psychological examination and a mental health medical source opinion. The ALJ was directed to reassess Sarah's residual functional capacity ("RFC") in accordance with relevant regulations and Social Security Rulings. R. 263.

A third ALJ hearing was held in this matter on April 6, 2023, and the ALJ issued his decision on July 28, 2023, finding Sarah not disabled and therefore ineligible for benefits. When the ALJ issued his determination, he applied the five-step evaluation process described in the regulations. R. 14–59.[4] The ALJ first found that regarding Sarah's DIB claim, she met the insured status requirements through December 31, 2021. R. 17. Sarah had not engaged in substantial gainful activity since her alleged onset date of May 4, 2018. Id. The ALJ next found that Sarah had severe impairments of bilateral hip impairment, bilateral shoulder impairments,

---

[4] The ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the residual functional capacity to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the ALJ finds that the claimant has been engaged in substantial gainful activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio v. Colvin, 780 F.3d 632, 634-635 (4th Cir. 2015). At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow her to return to her past relevant work, the claimant will be found "not disabled." If the claimant cannot return to her past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id. The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner on the fifth step. Monroe v. Colvin, 826 F.3d 176, 178–79 (4th Cir. 2016).

4

obesity, migraine headaches, chronic fatigue syndrome, left ankle impairment (fracture and surgical repair), history of Lyme disease, right knee impairment, hypothyroidism, cervical spine degenerative disc disease, depressive disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD"). R. 18. The ALJ next found that none of Sarah's impairments, either alone or in combination, met or equaled the criteria for a listed impairment. Id. The ALJ further found that Sarah had non-severe impairments of hypertension, asthma/dyspnea, hyperlipidemia, dermal mycosis, and pain in her right hand. Id.

The ALJ determined that from her alleged onset date of May 4, 2018, through November 18, 2021, Sarah had the RFC to do sedentary work with additional limitations. She needed the flexibility to use a cane when walking; was limited to occasional pushing and pulling, including operating foot controls with the right lower extremity; could only occasionally climb ramps or stairs, balance, stoop, or crouch; could never kneel, crawl, or climb ladders, ropes, or scaffolds; could only occasionally do overhead reaching with bilateral upper extremities; could only have occasional exposure to loud noise, vibration, or workplace hazards; was limited to jobs requiring understanding, remembering, and carrying out simple instructions and using judgment to make simple work-related decisions; was unable to do work requiring a specific production rate such as assembly line work or work requiring hourly quotas; was limited to only occasional interaction with the public, coworkers, and supervisors; and was limited to dealing with only occasional changes in a routine work setting. R. 24. The ALJ next found that Sarah could not return to her past relevant work, but, based on the testimony of the vocational expert (VE), could do other work in the national economy, such

as that of a dowel inspector, address clerk, or ampoule sealer, and therefore was not disabled. R. 42–43.

Regarding the period starting November 19, 2021, through the date of the decision, the ALJ found that Sarah could engage in light work with the additional limitations set forth above, except for needing the flexibility to use a cane and the pushing and pulling restriction. Based on the testimony of the VE, the ALJ determined that Sarah could do jobs such as mail sorter, office helper, and lamination machine operator, and found her not disabled. R. 43–59. Sarah sought review from the Appeal's Council, which denied review on March 13, 2024. R. 1–6. This lawsuit followed.

### III. Evidence

The court has considered all the evidence in the record and summarizes below the evidence relevant to Sarah's arguments.

Sarah was treated for bilateral hip pain and underwent hip replacement surgery on her right hip on October 9, 2020. R. 968–70. Prior to the surgery, Sarah reported constant severe right hip pain and weakness, and she sometimes used a cane when walking. R. 664, 656, 648, 774, 779. Imaging done on November 19, 2020, approximately five weeks after her hip replacement surgery, showed no hardware complication in her right hip and only mild degenerative changes in her left hip. R. 1029–30. On December 11, 2020, two months after hip replacement surgery, Sarah reported that she no longer had pain in her right hip and her mobility was much improved. R. 1154. In March 2021, Sarah said that her artificial hip was working well and provided her with good mobility and reduced pain. R. 1159. At a follow-up visit on October 20, 2021, Sarah was doing well and walking without assistance. She said her

6

pain and overall function were improved. She denied instability or problems with balance. R. 1188. Examination showed no pain in the hip with gentle range of motion, and normal strength and sensation. R. 1191. She was told to follow up in two years or as needed. R. 1192. She was advised that use of a cane or walker might help decrease the stress on the joint and improve her ability to ambulate. Id.

Sarah also has been treated for bilateral shoulder and cervical spine impairments. She complained of pain in her neck and upper back and weakness in her arms. R. 774, 815, 1113, 1202, 1207, 1217. Imaging showed mild, multi-level degenerative changes in her cervical spine in 2019 and mild AC joint degeneration in her left shoulder in 2019 and 2021. R. 860, 869–70, 1121. On examination in November 2020, she had no tenderness or spasms and full range of motion in her cervical and thoracic spine. R. 1039. An MRI of her left shoulder in 2021 showed high-grade tearing with areas of full-thickness perforation in the anterior supraspinatus, moderate grade articular-sided tearing of the infraspinatus with delamination, and low-grade undersurface tearing of the subscapularis. The doctor's impression was that Sarah had a small rotator cuff tear. R. 1111. Sarah was offered surgery to correct the rotator cuff tear but opted to defer surgery, saying she did not experience much pain. R. 1207, 1112, 1223. Imaging of her right shoulder in 2021 showed moderate degenerative changes in the AC joint, and high-grade partial thickness, predominantly interstitial tearing of the supraspinatus and infraspinatus tendons with a few small full-thickness components. R. 1203, 1252. In November 2021, she had neck muscle rigidity and spasms in her cervical spine. R. 1217. She was treated with anti-inflammatory medication and glucosamine chondroitin. R. 1218. Sarah also received injections

in her left shoulder, which provided good, but temporary relief. R. 806. In addition, she was referred to physical therapy. R. 1112.

On January 26, 2022, Sarah reported increased left shoulder pain and said she thought she tore her rotator cuff lifting a bale of hay. R. 1690. On February 22, 2022, Sarah had surgery to repair the torn rotator cuff in her left shoulder. R. 1344–52. On July 7, 2022, she reported that she was doing well and had no issues or pain. She was advised to continue to progress with activities as tolerated. R. 1604–05.

Sarah occasionally complained of migraine headaches to her providers, who treated her with medication. R. 676, 700, 708, 733, 743, 752. On February 9, 2017, the headaches were described as controlled, not intractable, and without status migrainosus. R. 676. On July 12, 2022, Sarah reported that her headaches had improved with medication and it was determined that she would be continued on the medication regimen. R. 1666.

Sarah also has a history of chronic fatigue syndrome, hypothyroidism, and Lyme disease. R. 675. On August 23, 2018, she said she was bedridden with lower leg swelling, had no energy and was "not able to do anything anymore," and the symptoms were attributed to chronic fatigue syndrome. R. 668. On July 9, 2021, and July 21, 2022, Sarah's hypothyroidism was described as stable on medication. R. 1223, 1664–66. At visits to her primary care provider from January 2022 through February 2023, Sarah did not report symptoms of fatigue. R. 1690, 1684, 1677, 1671, 1664, 1658. On February 3, 2023, she was noted to have bilateral swelling in her lower extremities with pedal edema and diminished pulses. R. 1658. She was advised to elevate her legs and use ice intermittently if needed for swelling or pain. She also was prescribed Lasix and told to return the following week if there was no improvement. R. 1659.

8

Sarah has a history of depression that has been treated with medication. R. 678, 670, 667, 589, 591, 593, 1780-88, 615, 625–26, 607, 1789, 604–05, 603, 629, 635, 1144–47, 1149–52, 1154–1157, 1161–1162, 1177–1180, 1164–68, 1241–1243, 1299, 1306, 1310, 1664–66, 1701, 1745, 1793–95. Sarah sometimes reported isolating herself and not being able to get out of bed for days because of depression and pain. R. 1780–81. On July 6, 2019, she was described as disheveled and unclean and as an animal hoarder living in a dilapidated, dirty, smelly home. Id.; R. 1783. Her affect was sad, anxious, and flat, and she was disoriented as to place, time, and situation. R. 1783–84. Her mood was depressed and her thought content, thought process, intellect, insight, judgment, impulse control, memory, concentration, attention, and behavior all were described as "inappropriate." In addition, her speech and motor skills were described as "slow." R. 1784.

Approximately six weeks later, on August 21, 2019, Sarah reported depression, panic attacks, and anxiety, but her mental status examination was within normal limits in all areas, although her score on the PHQ-9 test indicated severe depression. R. 615, 625.[5] On October 1, 2019, Sarah reported that her medications were effective in treating her symptoms. Her mental status examination was within normal limits and her mood was described as "good." R. 604–05. On December 2, 2019, Sarah reported that she was "doing pretty good," and her examination was within normal limits. R. 602–03.

---

[5] The Patient Health Questionnaire (PHQ-9) is a concise, self-administered tool for assessing depression. It incorporates DSM-IV depression criteria with other leading major depressive symptoms into a brief self-report instrument that is commonly used for screening and diagnosis, as well as selecting and monitoring treatment. https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last viewed July 13, 2025).

On May 1, 2020, Sarah told her mental health care provider that she felt depressed and anxious which often turned into panic attacks and she joked that she was a "mean person" and "always felt like killing people." R. 629. Her examination was within normal limits, except for a depressed mood, and she was moderately anxious. R. 645. Sarah refused additional medication or therapeutic intervention and said she was going to try herbal remedies. R. 637. She was told to return to the clinic in six weeks. R. 638. On July 7, 2020, Sarah denied depression, irritability, and feelings of anger and her mental status examination was unremarkable. R. 1144–47. In September and December 2020, Sarah reported being in a good mood and her mental status examination was within normal limits. R. 1149, 1154. In March 2021, Sarah said she was experiencing some depression and anxiety related to financial difficulties, but her sleep and appetite were good. R. 1158.

In May 2021, Sarah was described as guarded and depressed, but her examination was otherwise within normal limits. R. 1177. In September 2021, Sarah reported no changes and described her mood as "okay." The provider described her as cooperative and future oriented. On examination her mood was depressed but otherwise within normal limits. R. 1163–64. Findings were similar in February 2022. R. 1306–07. In July 2022, Sarah was noted to have depression but was doing much better on her current medications. R. 1664–66. In September 2022, it was noted that medication was helpful in controlling Sarah's symptoms of depression. Her mental status examination was within normal limits, but she had long-standing issues with sleep. R. 1701–08. In January 2023, Sarah said she was "doing great" and had no issues with medication. Her examination was within normal limits. R. 1753–68.

10

Sarah also has been diagnosed with obesity and morbid obesity. Her weight has fluctuated over the years, with a low weight of 247 lbs. and corresponding Body Mass Index ("BMI") of 34.5 in 2011, to a high of 337 lbs. with a corresponding BMI of 51.3 on June 24, 2022. R. 758, 1613.[6] Sarah's obesity has been treated with medication and recommendations for diet and exercise and she was referred for weight loss surgery but had not been cleared for the surgery by the time of the ALJ hearing. R. 72.

Finally, Sarah broke her left ankle in 2016 after slipping and falling while feeding horses. R. 850. She underwent an open reduction and internal fixation surgery on August 18, 2016. R. 840–46. On June 5, 2018, Sarah had severe edema of her left ankle and was educated on resting her feet and keeping them elevated. R. 668. On August 23, 2018, she had left ankle and pedal edema and tenderness. R. 667. On August 30, 2022, she had swelling in both ankles and feet. R. 1587.

### IV. Analysis

As set forth above, the ALJ determined that from her alleged onset date of May 4, 2018, through November 18, 2021, Sarah had the RFC to do sedentary work with additional limitations. R. 24. Based on this RFC and the testimony of the VE, the ALJ found that Sarah could not return to her past relevant work, but could do other work in the national economy, and therefore was not disabled. R. 42–43.

---

[6] BMI is a measure of body fat based on height and weight that applies to adult men and women. A BMI between 30 and 39 is considered obese and a BMI of 40 or over is considered extremely obese. https://www.nhlbi.nih.gov/calculate-your-bmi (last viewed July 25, 2025).

During the period of November 19, 2021, through the date of the decision, the ALJ found that Sarah could engage in light work with the additional limitations set forth above. Jobs existed for her in the national economy and she therefore was not disabled.

Sarah argues that these findings by the ALJ are not supported by substantial evidence. She contends that the ALJ (1) failed to properly consider the impact of her obesity on her other impairments and her RFC; (2) failed to make findings regarding whether her impairments would result in episodes of pain that would require her to take breaks, keep her from maintaining a static work posture, or require her to need to lie down; (3) failed to conduct a function-by-function analysis when making the RFC assessment; (4) failed to properly assess the opinion evidence of two of her providers; (5) failed to explain how the mental RFC accommodates Sarah's moderate limitations in concentrating, persisting, and maintaining pace and her moderate limitation in interacting with others; (6) failed to address her ability to sustain work over an eight-hour day; and (7) failed to properly assess her subjective allegations. Where appropriate, the arguments are addressed together.

**A. Obesity**

In Social Security Ruling 19-2p, Titles II and XVI: Evaluating Cases Involving Obesity, 2019 WL 2374244 (S.S.A. May 20, 2019) ("SSR 19-2p"), the Social Security Administration describes how a claimant's obesity should be evaluated.[7] Although obesity is not a listed impairment, it can be both a medically determinable impairment and a severe impairment. The

---

[7] Social Security Rulings (SSRs) are interpretations by the Social Security Administration of the Social Security Act. They do not carry the force of law but are binding on the Social Security Administration and ALJs when they are adjudicating Social Security cases. Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377, 387 n.9 (4th Cir. 2021) (internal citations omitted). SSRs are entitled to deference unless they are clearly erroneous or inconsistent with the law. Keller v. Berryhill, 754 F. App'x 193, 196 (4th Cir. 2018) (internal citations omitted).

functional limitations caused by obesity may increase the severity of a coexisting or related impairment to the extent that the combination of impairments medically equals a listing. Id. at *3–4. The adjudicator must consider a claimant's obesity when addressing the RFC as it may affect both exertional and non-exertional functions. It also may increase stress on weight-bearing joints and limit range of motion of the skeletal spine and extremities. Obesity may affect a person's ability to manipulate objects or their ability to tolerate extreme heat, humidity, or hazards. Additionally, obesity may affect a person's ability to sustain a function over time and may affect a person's ability to sustain work activity. Id. at *4.

If a claimant has been diagnosed with obesity and an ALJ does not mention the diagnosis, courts often remand for further consideration. Daisy F. v. Kijakazi, No. 2:21-cv-563, 2022 WL 18936086, at *7 (E.D. Va. Dec. 15, 2022) (citing Clifford v. Apfel, 227 F.3d 863, 873 (7th Cir. 2000)). Also, when an ALJ mentions obesity, but provides no analysis or discussion of the relationship between obesity and other physical impairments and functional abilities, some courts remand. Id. (citing Kimberly W. v. Comm'r Soc. Sec., No. 4:19-cv-00021, 2021 WL 827075, at *5 (W.D. Va. Mar. 3, 2021) adopted 2021 WL 1232101 (W.D. Va. Mar. 31, 2021) (Urbanski, J.) and Cassandra W. v. Kijakazi, No. CBD-20-153, 2022 WL 279828, at *7 (D. Md. Jan. 31, 2022)). "An ALJ is not required to provide a detailed analysis of the claimant's obesity, but 'a total failure to examine obesity in a disability hearing constitutes reversible error.'" Katherine T. v. Kijakazi, No. 6:21-CV-7, 2022 WL 4477703, at *8 (W.D. Va. Sept. 26, 2022) (Moon, J.) (quoting Richards v. Astrue, No. 6:11cv17, 2021 WL 5465499, at *6 (W.D. Va. July 5, 2012) (Moon, J.)).

Sarah argues that the ALJ failed to properly consider the impact of her obesity on her other impairments and her RFC. She points out that SSR 19-2p requires that obesity be discussed at every step of the evaluation and claims that there is no discussion of plaintiff's obesity after Step 3 of the sequential evaluation. She further argues that the ALJ gave "no weight" to her obesity impairment when he arrived at his RFC for the two time periods. Pl's. Br., ECF No. 15 at 40. In addition, she claims that the ALJ failed to account for the fact that her weight causes additional functional limitations not accounted for in his RFC determination and that her obesity exacerbates her other impairments and increases her pain, resulting in additional difficulties in her ability to sit, stand, and walk. Id. at 42. The record does not support these claims.

The ALJ found at Step 2 of the evaluation that Sarah's obesity was a severe impairment. R. 17. At Step 3, the ALJ noted that although there is no specific listing for obesity, he considered the effects of her obesity on her musculoskeletal, respiratory, cardiovascular, and endocrine systems, but the evidence of record did not show that Sarah's obesity exacerbated any condition to the point that her other impairments met the requirements for a listed impairment. R. 21. The ALJ also considered the effects of Sarah's obesity on her chronic fatigue syndrome but found that she did not meet a listing because while she occasionally endorsed fatigue, she did not appear fatigued on examinations and her chronic fatigue syndrome was treated with monitoring of labs as prescribed by her primary care physicians. R. 21.

In discussing Sarah's RFC, the ALJ noted that her obesity was treated with medications and recommendations for diet and exercise and she was referred to an obesity clinic. R. 28.

14

The ALJ acknowledged that Sarah was diagnosed with right hip pain due to severe arthritis and morbid obesity, for which she was told to lose weight by dieting and exercising to prepare for total right hip replacement surgery. R. 30. The ALJ also noted that the state agency medical consultants considered Sarah's significant obesity when they limited her to sedentary and light work with additional limitations. R. 36. The ALJ assigned more restrictive limitations than did the consultants in light of Sarah's occasional leg weakness on examinations, significant deficits on hip imaging studies, positive impingement testing with gait deficits, and her need to use an assistive device before she underwent hip surgery. R. 36–37.

The ALJ summarized the effects of Sarah's obesity along with her right hip, left ankle, and right knee impairments and found that the impairments taken together supported limiting her to sedentary work overall with the additional limitations noted for the period from May 4, 2018, through November 18, 2021. R. 31–32.

Regarding the period from November 19, 2021, through the date of the decision, the ALJ again discussed Sarah's obesity along with her hip, right knee, and left ankle impairments. He discussed her subjective complaints of weight gain, left hip pain, and bilateral leg swelling with redness and tenderness, along with evidence that she denied weakness and had full leg mobility. He also pointed to examinations where she had normal lung and cardiovascular signs and intact sensation with no extremity swelling or inflammation. He noted that on three visits to health care providers she had a wide-based gait, mild hip and shoulder pains, and leg swelling, tenderness, redness, pedal edema of +1, diminished pulses, and stasis dermatitis with left hip tenderness, while on other visits she had normal strength and gait. R. 47. Regarding the state agency consultants' opinion for the period from November 19, 2021, through the

date of the hearing, the ALJ noted that they considered Sarah's obesity along with the other evidence of record and found she could do a full range of light work. The ALJ found the opinions not fully consistent with the overall objective medical evidence of record and assigned additional limitations. R. 51–52.

The ALJ determined that the impairments, taken together and in the context of all the evidence of record, supported limiting Sarah to light work overall with additional postural, vibration, and hazard restrictions during the later period. R. 48–49.

The ALJ also discussed Sarah's obesity when he summarized her visits and examinations as part of the bariatric surgery assessment. She was assessed with severe obesity, psychological factors affecting her obesity, depression by report, and other mental health traits by report. She was not an appropriate candidate for bariatric surgery from a psychological perspective due to her poor sleep schedule and her need to develop coping skills. R. 51.

Finally, the ALJ accorded little weight to the opinion of a prior ALJ who had determined that Sarah could do medium work with additional limitations. The current ALJ determined that Sarah's persistent obesity with some gait deficits, along with her other impairments, were consistent with limiting her to light work with additional postural, environmental, and mental restrictions. R. 54.

Based on the foregoing, the court finds that the ALJ properly considered Sarah's obesity along with her other impairments as required by SSR 19-2p. He did not ignore her diagnosis of obesity but rather cited to it at Steps 2 and 3 of the sequential evaluation and in determining her RFC and explained why the effects of her obesity along with her other impairments did not render her disabled. Accordingly, remand is not warranted on this issue.

16

**B. Subjective Allegations**

Sarah argues that the ALJ failed to properly assess her subjective allegations. When evaluating a claimant's reported symptoms, the ALJ first considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. Once an underlying physical or mental impairment is established, the ALJ evaluates the intensity and persistence of symptoms to determine the extent to which the symptoms limit a claimant's ability to perform work-related activities. Social Security Ruling 16-3P Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) ("SSR 16-3P). In making the second determination, the ALJ first looks at the objective medical evidence. Id. at *5. If the ALJ cannot make a disability determination that is fully favorable based on objective medical evidence, other evidence, such as statements from the claimant, medical sources, and other sources are considered. Id. at *6.

In other words, the finding that an impairment could reasonably be expected to produce pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the symptoms. 20 C.F.R. § 404.1529(b). And while there need not be objective evidence of the pain itself or of its intensity, Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 95 (4th Cir. 2020) (citations omitted), the adjudicator is directed to consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between a claimant's statements and the rest of the evidence, including the claimant's history, the signs and laboratory findings, and statements by medical

17

sources or other persons about how the symptoms affect the claimant. 20 C.F.R. §
404.1529(c)(4).

### (1) Physical Impairments

Sarah testified at the ALJ hearing on April 6, 2023, that every other month she would
drive a truck and trailer out of state to pick up or deliver horses for her non-profit horse rescue
organization. Someone else would load and unload the horses for her. In the last few years,
she had driven occasionally to Pennsylvania, New England, and Florida. R. 74–76, 79. Once
or twice a month she drove for a delivery service. R. 76–77. She could drive for about four
hours before needing to take a break and elevate her legs for half an hour. R. 79–80. When
she was at home, she sat with her legs elevated to waist height approximately 90 percent of
the time. R. 80. The doctor recommended that she elevate her legs because the edema in her
legs made them painful, itchy, and hot. R. 81.

Her left shoulder felt better since the rotator cuff surgery in February 2022, but she
still had intermittent pain in her biceps and shoulder blade. Any time she was not resting she
had pain. R. 81–82. She could not pick up anything that weighed more than five pounds. She
also had issues with her right hand that made it difficult for her to pick up and hold things.
She wore a brace on the hand that helped with pain but she could not do a lot with the hand.
R. 82–83. She could probably not lift even a pound with her right hand. R. 84. She also had
pain and decreased range of motion in her right shoulder but it was not so problematic as to
require surgery. R. 84. In addition, she had pain in her neck "more often than not." Id.

Her right hip feels better since her hip replacement surgery, but her left hip was starting
to hurt intermittently. Activities such as walking, sitting, and driving made it worse. R. 85.

18

Sarah had approximately five to ten migraine headaches per month which lasted several hours if she took her prescribed medication at onset. If she waited to take the medication, the headache would last until she took the medication. R. 85–86.

All of her joints ache and she could not sit for more than half an hour before needing to move around. She could stand for only five minutes because she did not have a lot of strength in her legs. She was too proud to use a cane to help her walk. She fell any time she tried to do something longer than five or ten minutes on her feet. R. 87.

She was always fatigued. Depression caused her to stay bedridden for days at a time. She isolated herself and had groceries delivered to her house. She spent "a good chunk of the day" lying in bed. She lived alone, used the microwave to cook meals, and did not clean her house. R. 88–90. She had trouble concentrating and focusing and with her memory. R. 91. She did not currently have horses on her property or other animals besides two dogs. She had not lifted any animal feed or hay in at least two years. R. 93–94.

For the period from May 4, 2018, through November 18, 2021, the ALJ found that Sarah's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with her reporting of a wide range of daily activities. In particular, he pointed to Sarah's testimony that she occasionally drove out of state to transport horses and that she worked as a delivery driver in early 2023. In addition, she told her therapist in 2018 that she ran a part-time non-profit business where she could make her own schedule and cancel if necessary and there are references in the record to her hauling animals for the non-profit. R. 25. In October 2018, she reported cleaning stalls and the next month she reported working more. In January 2019, she reported that she had been castrating a horse when she was hit by

one of his hooves. In December 2019, she reported having recently "wrestled" a horse. In January 2020, she reported being stressed because she ran a horse rescue without help. In May 2020, she said that she relied solely on her hobby of rescuing horses to support herself financially. In July 2020, Sarah stated that she enjoyed working with horses, had been making some money selling them, and was going outside in the evenings when it was cooler. In August 2020, Sarah reported working at Papa John's for up to five hours at a time, but it caused her severe pain. The next month, she said she was trying to do too much work at home with the horses, but she enjoyed it. In November 2020, Sarah reported actively walking after completing six physical therapy sessions following her hip surgery. In June 2021, she told her orthopedic provider that she drove multiple hours for work and she told her psychiatrist that she was independent in her activities of daily living. She did fairly well with hygiene, despite doing a poor job with household chores. She could keep appointments, and she ran a horse rescue and trained horses. The ALJ concluded that "despite the claimant's allegations of severity and debility, she admitted to engaging in a wide range of daily activities, which included running a non-profit horse rescue that required her to castrate horses, wrestle with horses, transport horses among multiple states, and being [in]dependent with daily activities," which show that she is not as limited as alleged. R. 26.

For the later period of November 19, 2021, through July 28, 2023, the ALJ also found that Sarah's allegations about the disabling nature of her symptoms were not consistent with other evidence in the record. In November 2021, Sarah reported that she was stuck in Erie, Pennsylvania because she had made a trip to pick up horses and her truck had broken down. She was waiting for a transmission to be shipped and was using a credit card to pay for her

expenses. The next month she reported driving horses to Florida and the trip went well, except that she had increased left shoulder pain from lifting a bale of hay. She continued to feed her horse after the injury although her arm was in a sling. In March 2022, she traveled out of town for the horse rescue. In June 2022, Sarah reported that she cooked if she went to a friend's house but otherwise ate out five or six times per week and she said she was not more physically active because she was always on the road driving horses around. In July 2022, she reported being out of town a lot and being busy. In August 2022, Sarah said she ate out often, worked out on her elliptical trainer or recumbent bicycle for five to ten minutes daily, lived with two dogs and a litter of kittens, and stayed up to make money in transport by working for two days at a time. In September 2022, she mentioned having goats that were being cared for by a friend in exchange for a place to stay. Sarah also told her health care provider that she was doing chores, being more active, and using her elliptical for fifteen to twenty minutes daily, was walking more as she was able, and was lifting animal feed and hay. Later that month she reported using the elliptical for five to ten minutes per day and said that her time was impacted by her busy schedule. In October 2022, she reported keeping busy with the horse rescue and enjoying it. In November 2022, Sarah reported going through some old storage bins and also reported that she had been walking her dogs around a friend's hilly neighborhood and had been using the elliptical or recumbent bicycle for 30 minutes a day. In January 2023, Sarah said she was doing deliveries for the Roadie App to make extra money and also was working for a company delivering foods. R. 45. The ALJ concluded that Sarah's wide range of activities showed that she is not as limited as alleged. Id.

Sarah argues that the ALJ ignored evidence that since October 2018, records "consistently document" that Sarah was no longer able to train horses and was trying to rescue and provide shelter for them. Pl's. Br., ECF No. 15 at 59. The ALJ did not ignore this evidence but found that activities Sarah undertook as part of her horse rescue organization, as well as some of her other activities and other evidence in the record, were not consistent with her subjective complaints. The court finds that the ALJ adequately supported his determination as to Sarah's subjective complaints by citing to substantial evidence in the record.

### (2) Mental Impairments

The ALJ acknowledged Sarah's complaints of depression, inability to function, panic attacks, decreased energy, anxiety, violent thoughts, difficulty being in relationships with others, agitation with thoughts of hurting others, poor sleep, poor ability to deal with situational stressors, self-isolation, poor memory, worsening rage on one occasion, rare mood swings, irritability, anhedonia, and low energy. R. 35, 52. He also noted her July 2019 assessment to receive skills training showed multiple mental health deficits. R. 35.

However, the ALJ did not find Sarah's complaints of disabling mental health issues to be consistent with the other evidence in the record. The ALJ cited to Sarah's primary care visits which showed normal mood, affect, speech, comprehension, memory, insight, attention, concentration, judgment, and thought processes, except for one instance of depressed mood, impaired memory and attention, and some homicidal ideation after not getting her medications. Her 2018 therapy sessions showed slight mood deficits but otherwise were within normal limits. Her mental health examinations at physical medicine and rehabilitation visits were within normal limits. In 2019 visits to her psychiatrist, Sarah was noted to have normal

appearance, behavior, orientation, speech, thoughts, insight, judgment, memory, and intelligence with good moods. Her 2020 and 2021 visits were similar except for some depressed or anxious moods. Sarah was treated for depression and anxiety with Effexor or propranolol with adjustments to dosages over time and her depression was noted as being stable on medication. She also briefly attended therapy and case management sessions. R. 36. She typically was pleasant at examinations and reported doing well overall with good moods at regular case-manager check-ins. R. 52. While she sometimes showed deficits on examination, she usually had normal affect, orientation, mood, speech, comprehension, attention, concentration, insight, judgment, and thought processes. R. 52.

Sarah pointed to records showing that she sometimes had a depressed or anxious mood, that at a mental health assessment in July 2019 she had severe deficits, and that her PHQ-9 score indicated severe depression on August 16, 2018, and August 21, 2019. Pl's Br., ECF No. 15 at 60. The ALJ acknowledged these records, R. 34–35, 52, as well as Sarah's descriptions of her depression and anxiety symptoms. Nevertheless, the ALJ found that Sarah's subjective allegations related to her mental health impairments were not consistent with other evidence in the record and explained clearly how he reached this conclusion. R. 36, 52. The court finds that the ALJ adequately assessed Sarah's subjective mental health allegations in the context of the entire record and his determination that the allegations are not consistent with the record is supported by substantial evidence.

### C. Opinion Evidence

Sarah argues that the ALJ did not properly assess the opinions of two of her health care providers. When considering medical opinions, an adjudicator does not defer or give

23

specific evidentiary weight to any medical opinion, including those from a treating source. Rather, the adjudicator must examine the supportability of the opinion by objective medical evidence and supporting explanations presented by the medical source, the consistency of the opinion with the evidence from other medical and non-medical sources in the record, the source's relationship to the claimant, the source's specialization, and any other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c and 416.920c. The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). An ALJ must explain how supportability and consistency were considered in his decision and may, but is not required to, explain how the other factors are considered. Kristin H. v. Comm'r of the Soc. Sec. Admin., No. 9:24-cv-03172-JDA-MHC, 2025 WL 2086108, at *4 (D.S.C. July 8, 2025). "Supportability" refers to the extent to which a medical source's opinion is supported by objective medical evidence and the explanation of the evidence by the source. Id. "Consistency" refers to the extent to which an opinion is consistent with evidence from other medical sources and nonmedical sources in the record. Id. (citations omitted).

### (1) Kelli Cash

Physician Assistant Kelli Cash completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" on November 3, 2021. R. 1183–88. Cash indicated that she had first treated Sarah on October 24, 2018, and had seen her every three to five months during the previous three years, with Sarah being seen by a specialist between visits. R. 1186–87. Cash said Sarah was limited to lifting less than ten pounds frequently and occasionally. She could stand or walk less than two hours in an eight-hour workday and sit for less than two hours in an eight-hour workday. R. 1183–84. She would need breaks in addition to regular

24

lunch and rest breaks to relieve pain and fatigue and would need to lie down or recline for four hours in an eight-hour workday. R. 1184. She had a limited ability to push and pull with her upper and lower extremities because of chronic joint pain. R. 1183–84. She could only occasionally balance or stoop and never climb, kneel, crouch, or crawl, because "all positions cause extreme pain, muscle lock up and days of recovery and rest." These limitations were caused by "osteoarthritis, bone spurs, degenerative joint disease, B12 deficiency, bone pain, obesity, myalgias/spasm." R. 1185. Sarah was limited to occasional fingering and frequent reaching, handling, and feeling because her hands went numb with any positional changes, she had shoulder and wrist pain all the time because of arthritis, and she reported that reaching for objects caused pain in her neck and shoulders. Id. She should not be exposed to temperature extremes, dust, vibration, or humidity and heat because she had panic attacks in the heat, and cold and humidity exacerbated her arthritis. She also had a dust allergy. Cash predicted that Sarah would be absent from work approximately eight times per month and would be late daily. Cash opined that these limitations were present as early as May 4, 2018. R. 1186.

The ALJ found Cash's opinion partially persuasive for the period from May 4, 2018, to November 18, 2021. The ALJ acknowledged that Cash had been treating Sarah for three years and generally supported the restrictions with references to Sarah's diagnoses, pain, spasms, need for hip replacement, and alleged neck and shoulder pain with reaching. However, the environmental limitations were not consistent with Cash's own treatment notes, which showed no allegations of sensitivity to environmental restrictions and typically showed normal pulmonary signs on examinations. R. 39. The ALJ also found that the work break restriction,

25

fingering restriction, predicted work absences, and environmental restrictions were not consistent with Sarah's normal gait, leg strength, and sensation, and mild pain with right hip movement on examination after Sarah's hip replacement surgery. Id. Nor were the restrictions consistent with Sarah's reports that she ran the horse rescue organization which included hauling animals across state lines, cleaning stalls, and castrating and wrestling horses. Id.

The ALJ found Cash's opinion unpersuasive for the period of November 19, 2021, through July 28, 2023. He cited Sarah's reports of long-distance trips to Pennsylvania and Florida to transport horses, lifting hay bales and animal feed, exercising regularly, walking her dog on hills, and doing delivery driver work. R. 55. In addition, Sarah had a positive response to the left shoulder surgery and had few joint or gait deficits at primary care. Id. Because Cash's opinion only referenced records from before November 19, 2021, it was not consistent with later-submitted treatment records which showed that Sarah's condition had improved over time. R. 56.

Sarah argues that the ALJ's determination that Cash's opinion was only partially persuasive for the earlier period and unpersuasive for the later period is not supported by substantial evidence. She points out that after hip replacement surgery, Sarah was assessed as having a wide-based and irregular gait on several occasions. In addition, she was using a cane in June 2021, approximately eight months after her hip surgery. Pl's. Br., ECF No. 15 at 46–47. However, the ALJ considered this evidence, but nevertheless found that the limitations in Cash's medical source opinion were overly restrictive. The ALJ cited to the record, including Sarah's reported activities related to the horse rescue, her daily exercise in 2023, her occasional work as a delivery driver, and the many normal findings on examination by her medical

providers. The court finds that the ALJ's decision to accord Cash's opinion only partial weight for the first period at issue and no weight for the later period is supported by substantial evidence and provides no basis for remand.

### (2) Johna Jenkins

On November 17, 2021, Johna Jenkins, a nurse practitioner, completed a "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)." She found that Sarah had mild limitations in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, and be aware of normal hazards and take normal precautions. She found Sarah had a moderate limitation in her ability to maintain attention for a two-hour period and to ask simple questions or request assistance. She indicated that Sarah had a marked limitation in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday or workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instruction and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress. R. 1241–42.

Jenkins attributed the limitations to Sarah having depression and PTSD-related anxiety which caused difficulties and deficits when interacting with others and the public, and in

dealing with occupational stressors. Sarah reported poor anger management skills, social anxiety, a lack of energy and motivation, and an inability to remain employed. R. 1242.

Jenkins also found that Sarah had a moderate limitation in her ability to understand and remember detailed instructions, carry out detailed instructions, and set realistic goals or make plans independently of others, and a marked limitation in her ability to deal with the stress of skilled and semi-skilled work. This assessment was based on Sarah's reports of deficits in dealing with stressors and poor anger coping skills. R. 1243. Jenkins further found that Sarah had a moderate limitation in her ability to adhere to basic standards of neatness and cleanliness and a marked limitation in her ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. Jenkins did not explain these last findings or identify the medical or clinical findings that supported her assessment. Id. Jenkins predicted that Sarah would be absent from work more than three times per month. R. 1244.

The ALJ explained that he found Jenkins' opinion unpersuasive because she had seen Sarah only two times prior to formulating the opinion and provided no support for her opinions other than by citing to Sarah's subjective complaints. The ALJ noted that Jenkins' own treatment notes showed that Sarah had some mood deficits, but had normal orientation, speech, thoughts, sensorium, memory, insight, judgment, and intellect on examination, which did not support the severe restrictions she assessed. Nor were the restrictions consistent with Sarah's normal mental signs at most primary care examinations, and her conservative treatment with medication and brief therapy. R. 40, 57. Contrary to Sarah's argument that the ALJ did not adequately explain why he found Jenkins' opinion unpersuasive, the ALJ's

explanation as to the supportability and consistency of Jenkins' opinion is based on evidence in the record and is sufficient.

### D. RFC Assessment

Sarah argues that the ALJ failed to conduct a function-by-function analysis when making his RFC assessment and failed to make findings regarding whether her impairments would result in episodes of pain that would require her to take breaks or keep her from maintaining a static work posture or need to lie down. She also argues that the ALJ failed to address her ability to sustain work over an eight-hour day.

A claimant's RFC "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *2 (S.S.A. 1996) ("SSR 96-8p"). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

As the Fourth Circuit emphasized in Monroe v. Colvin, 826 F.3d 176, 187–88 (4th Cir. 2016), under SSR 96-8p, an RFC assessment must first identify the claimant's functional limitations or restrictions and assess his work-related abilities on a function-by-function basis, including the functions listed in the regulations. Only after such an analysis may an ALJ express

the claimant's RFC. Arriving at the RFC before analyzing the claimant's limitations function-by-function creates the danger that the adjudicator will overlook relevant limitations or restrictions or that the adjudicator will find limitations or restrictions that the claimant does not actually have. Id. However, there is no per se rule that a case must be remanded when an ALJ does not perform an explicit function-by-function analysis. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Rather, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. See also Owens v. Kijakazi, No. 22-1273, 2023 WL 2344224, at *3 (4th Cir. 2023) ("The driving consideration is whether the ALJ's analysis allows for meaningful judicial review.")

**(1) Physical RFC Assessment**

Sarah argues that the ALJ failed to make specific findings as to whether she would need breaks due to pain, and did not properly consider whether her pain is so continuous or severe that it prevents her from working a full eight-hour workday. However, the ALJ considered the impairments that Sarah alleged caused her so much pain that she cannot work a full day but did not find them consistent with the rest of the record.

Regarding Sarah's shoulder and cervical spine impairments for the period prior to November, 18, 2021, the ALJ summarized the record related to these impairments as occasional shoulder and neck pain with weakness or numbness, multiple tears on shoulder x-rays with mild to moderate arthritis, mild cervical spine degeneration, some shoulder or neck area tenderness with neck rigidity or spasms, positive impingement testing, and one instance of right shoulder weakness, noting that the shoulder and neck problems were treated

conservatively with pain or injections. The ALJ then stated that the evidence supported limiting Sarah to sedentary work with additional restrictions related to climbing, crawling, reaching overhead, vibrations and hazards. R. 23, 28. After her shoulder surgery, to which she had a positive response, the ALJ found that Sarah could do light work with additional postural and reaching restrictions. R. 43–44, 47.

The ALJ also summarized the effects of Sarah's hip, left ankle, right knee, and obesity impairments for the period prior to November 18, 2021. He found that Sarah's persistent hip complaints with weight gain, severe right hip arthritis and moderate left hip arthritis, stable right hip replacement, mixed signs on examinations that included hip tenderness on movement, occasional leg weakness and gait deficits, but also normal coordination, sensation, and reflexes, and her positive response to hip injections and hip replacement surgery, all supported limiting her to sedentary work overall with additional use of a cane, push and pull restrictions, and postural, vibration, and hazard restrictions. R. 23, 32.

After November 19, 2021, the ALJ found that Sarah had significantly decreased pain, largely normal physical examinations aside from elevated BMI readings and occasional wide-based gait or mild hip pain with movement, and one instance of leg swelling and tenderness with hip tenderness. Following the hip surgery, she was treated with pain medication, nutrition, and exercise counseling. The ALJ found that these impairments supported limiting her to light work with additional postural, vibration, and hazard restrictions. R. 43–44, 48–49. The ALJ discounted PA Cash's opinion that Sarah would need to rest for four hours during an eight-hour workday because of pain and fatigue and could walk and sit less than two hours per day

based on examination findings that Sarah had normal gait, leg strength and sensation, and mild hip pain after surgery, as well as on her activities related to the horse rescue. R. 39, 55–56.

Although the ALJ did not perform an explicit function-by-function assessment in his determination, remand is not necessary because the ALJ fully assessed Sarah's capacity to perform relevant functions and adequately explained how he arrived at his determination that she could do sedentary, and later, light work with additional limitations. The ALJ "showed his work" when he explained why her limitations did not translate to a total inability to work, and his reasoning allows the court to meaningfully review his conclusions. Ward v. Dudek, No. 22-1555, 2025 WL 1232629, at *5 (4th Cir. 2025).

### (2) Mental RFC Assessment

Before reaching the mental RFC assessment at Step 4 of the sequential evaluation, the adjudicator must first determine whether a claimant has a severe mental impairment at Step 2 of the sequential evaluation, and if so, whether she meets a listing for a mental impairment at Step 3 of the sequential evaluation. In making the Step 3 determination, the adjudicator assesses an individual's limitations and restrictions described in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The mental disorders listings are set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 404.1520a, 404.1525, 404.1526. The adjudicator determines whether the claimant's limitations are none, mild, moderate, marked, or extreme. 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.00(E) and 12.00(F).

To satisfy "paragraph B" criteria for a finding of disabled at Step 3, a person must have an "extreme" limitation of one, or a "marked" limitation of two of the four areas of mental

functioning. Id. § 12.00A(2)(b). The areas of mental functioning are (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting or managing oneself. Id. §12.00(E). Relevant to Sarah's case, a "moderate" limitation means the person has a fair ability to function in this area independently, appropriately, and effectively on a sustained basis. Id. §12.00(F)(2)(c). A "marked" limitation means that the claimant has a seriously limited ability to function in this area independently, appropriately, effectively, and on a sustained basis. Id. § 12.00(F)(2)(d).

Notably, the limitations identified in the listing criteria are not an RFC assessment, and the mental RFC assessment used at Steps 4 and 5 of the sequential evaluation process requires a more detailed assessment "by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings." SSR 96-8p, 1996 WL 374184 at *4. When determining a claimant's RFC at Step 4 of the sequential evaluation, the adjudicator considers the claimant's medical history, medical signs and laboratory findings, the effects of treatment, reported daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured environment, and work evaluations, if available. Id. at *5. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. at *7.

In Sarah's case, at Step 3 of the sequential evaluation, the ALJ determined that she had a moderate limitation in the four domains: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and

adapting and managing oneself. R. 22. Because she did not have at least two "marked" limitations or one "extreme" limitation, the paragraph B criteria of the listed impairments were not met. Id.

Sarah argues that the ALJ did not explain why he found that she had no more than a "moderate" limitation in the domain of concentrating, persisting, and maintaining pace and in interacting with others. She points to reports in the record that Sarah was described as having a depressed mood and flat affect at several appointments, her PHQ-9 score reflected severe depression in August 2018 and August 2019, and that one provider who conducted a home visit in 2019 reported that Sarah was unclean and disheveled, and her home was dirty and smelled. Another provider in assessing Sarah for bariatric surgery noted that she lacked coping skills and needed to develop them. Pl's Br., ECF No. 15 at 51–52.

Contrary to Sarah's assertion, the ALJ considered this evidence, along with the other evidence in the record showing that when Sarah's mental status was assessed at primary care visits, therapy visits, physical medicine and rehabilitation visits, and psychiatric visits, she typically was assessed as having normal mood, affect, speech, comprehension, memory, insight, attention, concentration, judgment, and thought processes, except for occasional instances of depressed or anxious mood, impaired memory and attention, and homicidal ideation on one occasion after not getting her medication. Sarah was treated for depression and anxiety with medication and described as stable on medication. R. 36. Sarah typically was pleasant at examinations and reported doing well overall with good moods at regular case-manager check-ins. R. 52.

The ALJ adequately explained by citation to the evidence why he found that Sarah had no more than moderate limitations in her abilities to concentrate, persist, and maintain pace, and in interacting with others. He explained why he did not find Sarah's subjective description of her impairments to be consistent with the record and also explained why he found the opinion of Nurse Practitioner Jenkins to not be supported by her own examinations or consistent with the other evidence in the record. Except for a few visits where Sarah was described as having a depressed or anxious mood, and the assessment in 2019 when she was described as having severe deficits, her examinations were within normal limits. Substantial evidence supports the ALJ's determination that Sarah has no more than a moderate limitation in the domains of concentrating, persisting, and maintaining pace, and in interacting with others.

When the ALJ reached the RFC assessment at Step 4, he summarized Sarah's hearing testimony and reviewed the medical evidence and opinion evidence. R. 24–25, 33–36, 50–52. Based upon his assessment of the record, for both periods at issue the ALJ limited Sarah to jobs requiring understanding, remembering, and carrying out simple instructions, using judgment to make simple work-related decisions, no specific production-rate jobs such as assembly line work or work requiring hourly quotas, only occasional interaction with the public, coworkers, and supervisors, and jobs requiring dealing with only occasional changes in a routine work setting. R. 23, 36, 44, 52.

Sarah argues that the ALJ did not explain how his RFC findings address her moderate limitations of concentrating, persisting, and maintaining pace, and interacting with others. However, after extensively reviewing the medical evidence, Sarah's testimony, and other

subjective statements, and the opinions of the state agency mental health experts, the ALJ

explained the following for the period of May 4, 2018, through November 18, 2021:[8]

> [T]he claimant's persistent mental complaints, which included difficulty getting along with others, dealing with stressors, and remembering; her largely normal mental signs on exams, aside from occasional mood deficits with rare memory and attention deficits; and her positive response to conservative treatment of medications and brief therapy, all support simple instruction, simple decision making, production rate, social interaction, and work change restrictions as outlined in the above residual functional capacity.

R. 33–36. The ALJ also explained how he arrived at the mental health RFC for the later period:

> [T]he claimant's rare mood, anger, anhedonia, low energy or motivation, sleep, and social interaction complaints[,] her generally normal mental signs on exams, aside from rare affect, mood, or behavior deficits; and her positive response to conservative treatment of medication refills with slight dose adjustments, case manager check-ups, and psychological check-ups, all support simple instruction, simple decision making, production rate, social interaction, and work change restrictions as outlined in the above residual functional capacity.

R. 50–52.

These explanations by the ALJ are sufficient to allow meaningful review. He provided

a comprehensive review of the evidence, resolved the conflicts, and clearly explained how he

arrived at Sarah's RFC based on the evidence. The court concludes that the ALJ applied the

correct legal standards in evaluating Sarah's claim for benefit and cited to substantial evidence

in support of his conclusion. Accordingly, there is no basis for remand based on the RFC

assessment.

---

[8] The state agency experts found that Sarah had only mild limitations in the Paragraph B criteria. The ALJ found that the evidence supported greater limitations for Sarah and therefore found the opinions of the state agency experts to be not persuasive. R. 37, 53–54.

## V. Conclusion

The court concludes that the ALJ in this case carefully and thoroughly explained how he reached his conclusions, and that he "built the logical bridge" between the evidence in the record and his conclusions. His determination that Sarah is not disabled is supported by substantial evidence in the record. Accordingly, the court **AFFIRMS** the Commissioner's decision that Sarah is not disabled. This matter is **DISMISSED** and **STRICKEN** from the active docket of the court.

An appropriate order will be entered.

It is so **ORDERED**.

Entered:  08-13-2025

Michael F. Urbanski
Senior United States District Judge